**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO.

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.

**APPROXIMATELY $1,001,104.35 SEIZED FROM ACCOUNT NO. 898142110170 AT BANK OF AMERICA,**

**APPROXIMATELY $433,475.70 SEIZED FROM ACCOUNT NO. 898142110248 AT BANK OF AMERICA,**

**APPROXIMATELY $5,069,040.55 SEIZED FROM ACCOUNT NO. 4022309941 AT JPMORGAN CHASE BANK, and**

**APPROXIMATELY $45,157.84 SEIZED FROM ACCOUNT NO. 926276228 AT JPMORGAN CHASE BANK,**

      **Defendants *In Rem*.**

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States, alleges as follows:

**I.  NATURE OF THE ACTION**

1.  This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(A), (C) and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, to forfeit seized funds, more fully described as (collectively, "**Defendant Accounts**"):

(i) Approximately[1] $1,001,104.35 in U.S. currency seized from account number 898142110170 at Bank of America ("**Defendant Account 1**");
(ii) Approximately $433,475.70 in U.S. currency seized from account number 898142110248 at Bank of America ("**Defendant Account 2**");
(iii) Approximately $5,069,044.50 in U.S. currency seized from account number 4022309941 at JPMorgan Chase Bank ("**Defendant Account 3**"); and
(iv) Approximately $45,157.84 in U.S currency seized from account number 926276228 at JPMorgan Chase Bank ("**Defendant Account 4**").

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the **Defendant Accounts**. *See* 28 U.S.C. §§ 1345, 1355(b).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District where the **Defendant Accounts** were brought upon seizure. *See* 28 U.S.C. §§ 1355(b)(1), 1395; 18 U.S.C. § 981(h).

## III. FACTUAL ALLEGATIONS

At all times material to this Action:

### A. Underlying offense generating Medicare reimbursements.

#### i. *The Medicare Program*

5. The Medicare Program ("Medicare") was a federal health care program that provided free or below-cost health care benefits to individuals who are 65 years of age or older or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency the

---

[1] All dates and amounts referenced in this Verified Complaint are approximate.

Center for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

6. Each Medicare beneficiary was identified with a unique beneficiary identifier number ("BIN"). These BINs were used, among other things, to determine a beneficiary's eligibility for Medicare benefits, and to submit claims to Medicare seeking reimbursement for covered benefits, items, and services.

7. Medicare was subdivided into multiple program "parts." Medicare Part B covered physician services and outpatient care, including an individual's access to durable medical equipment (DME), such as orthotic devices and wheelchairs.

### ii. *COVID-19 Pandemic and Mass Immunization Providers*

8. In response to the COVID-19 health emergency, Medicare created a provider enrollment classification of "Mass Immunization" provider. An entity or individual who wished to furnish mass immunization services -- but may not otherwise have qualified as a Medicare provider -- may have been eligible to enroll as a "mass immunizer" via the Form CMS-855I (individuals) or the Form CMS-855B (entities).

9. Starting April 4, 2022, and continuing through the end of the COVID-19 public health emergency, Medicare covered and paid for over-the-counter ("OTC") COVID-19 tests at no cost to beneficiaries with Medicare Part B, and those with Medicare Advantage plans. This program was intended to ensure Medicare beneficiaries had access to COVID-19 tests they needed to stay safe and healthy during the COVID-19 pandemic.

10. Eligible providers capable of providing ambulatory health care services were permitted to distribute U.S. FDA-approved, authorized, or cleared OTC COVID-19 tests to

Medicare beneficiaries. Eligible Medicare patients would get these tests at no cost, and their annual deductible, coinsurance, and copayment did not apply. Mass Immunizers were included as an eligible provider.

11. Medicare would not pay for more than eight OTC COVID-19 tests, per calendar month, per Medicare beneficiaries. Providers could distribute the OTC COVID-19 tests only to Medicare beneficiaries who requested them. Providers were required to keep documentation showing a Medicare beneficiary's request for the test.

12. Medicare did not cover OTC COVID-19 tests billed by durable medical equipment suppliers or providers who distributed OTC COVID-19 tests to Medicare beneficiaries during an inpatient stay at a hospital or skilled nursing facility.

13. A Medicare claim for OTC COVID-19 test reimbursement was required to set forth, among other things, the beneficiary's name and unique Medicare identification number, the number of OTC COVID-19 tests provided, the date the test was provided, and a fixed billable rate of $12 per kit. A prescribing physician was not required for the OTC COVID-19 test.

14. Medicare and Medicare drug plan sponsors were "health care benefit program[s]," as defined by 18, U.S.C. § 24(b).

### iii. Relevant Individual and Entities

15. Pharmacy 1 was a Texas company, which purportedly provided OTC COVID-19 tests to Medicare beneficiaries.

16. Individual 1, a resident of Broward County, has been the sole member, President and Registered Agent of Pharmacy 1 since January 2023 (the "relevant period"). As discussed further below, the evidence shows that Individual 1 caused, and aided and abetted, the submission of false and fraudulent health care claims referenced herein.

17. During the relevant period, Individual 1 was listed as the owner and manager of Pharmacy 1's corporate bank accounts (the **Defendant Accounts**), which received payments from Medicare for the claims identified above. The signature on the account signature cards matches the signature on Individual 1's Florida driver's license records.

18. Individual 1 was listed in the Medicare enrollment documents for Pharmacy 1 as the sole owner and authorized official of Pharmacy 1. During the relevant period, an application to Medicare requesting approval for Pharmacy 1 to become a Mass Immunizer was submitted to Medicare. The signature on the application matches Individual 1's signature from the records described above in paragraph 17.

### iv. *Submission of False Claims to Medicare*

19. From January 2023 through May 2023, Pharmacy 1 submitted claims for OTC COVID-19 tests to Medicare totaling $11,376,277, and Medicare paid Pharmacy 1 $8,050,743 for those claims, as documented by Medicare claims data. The claims were submitted for over 84,230 Medicare beneficiaries with at least 1,500 Medicare beneficiaries residing in the Southern District of Florida.

#### 1. Beneficiary Complaints

20. The Medicare Benefit Integrity Unit received 226 complaints from Medicare beneficiaries regarding Pharmacy 1. The complaints all indicated that the Medicare beneficiaries did not know Pharmacy 1, did not request COVID-19 tests from Pharmacy 1, and did not want and/or receive COVID-19 tests from Pharmacy 1, despite the fact that OTC Covid-19 Tests had been billed for using their BINs.

21. Qlarant, a CMS Unified Program Integrity Contractor for the West and Southwest geographic areas of the United States including Texas, received multiple Medicare beneficiary

complaints received between April 2023 to May 2023 regarding Pharmacy 1. Investigators interviewed multiple Medicare beneficiaries with paid claims to Pharmacy 1, who all confirmed they did not want or request COVID-19 tests from Pharmacy 1.

### 2. Shared Beneficiary Information

22. A comparison was conducted of Medicare beneficiaries billed by Pharmacy 1 for COVID-19 tests that were also billed for COVID-19 tests by Pharmacy 2. Pharmacy 2 is a Florida corporation, located in Broward County. Records from the Florida Department of State Division of Corporations show that Individual 1 is the owner of Pharmacy 2.

23. The comparison identified over 17,380 Medicare beneficiaries common to both Pharmacy 1 and Pharmacy 2. The Medicare Benefit Integrity Unit received over 10,278 complaints from Medicare beneficiaries regarding Pharmacy 2. The complaints all indicate the Medicare beneficiaries did not know Pharmacy 2, did not request COVID-19 tests from Pharmacy 2, and did not want and/or receive COVID-19 tests from Pharmacy 2.

24. Additionally, Safeguard Services, a CMS Unified Program Integrity Contractor for the East geographic area of the United States, interviewed multiple Medicare beneficiaries that filed complaints against Pharmacy 2. All confirmed they did not want or request COVID-19 tests from Pharmacy 2.

### B. Disbursement of Medicare Funds to the Defendant Accounts

25. Law enforcement reviewed bank records for the **Defendant Accounts** and learned that all the **Defendant Accounts** were funded with Medicare disbursements based on the claims Pharmacy 1 submitted for OTC COVID-19 tests.

26. Based on signature cards provided by Bank of America and JPMorgan Chase Bank, Individual 1 opened **Defendant Accounts 1**, **2**, and **3** on April 12, 2023, and Individual 1 opened

**Defendant Account 4** on February 8, 2023. Individual 1 has signatory authority on all the **Defendant Accounts**.

27.     **Defendant Account 1** and **Defendant Account 2** were closed by Bank of America on August 11, 2023, based upon its belief the accounts contained proceeds of health care fraud. **Defendant Account 3** and **Defendant Account 4** were locked by JPMorgan Chase Bank on June 7, 2023, based upon its belief the accounts contained proceeds of health care fraud.

28.     Law enforcement seized the funds formerly on deposit in the **Defendant Accounts** in September 2023 pursuant to seizure warrants issued by Magistrate Judge Alicia O. Valle. 23-6417-AOV; 23-6418-AOV.

29.     Medicare disbursed $8,055,532.26 to **Defendant Account 4** between April 10, 2023, and May 26, 2023, for the claims described above. Prior to the first disbursement from Medicare, the balance of **Defendant Account 4** was $7,659.53. There were an additional $3,543,516.17 in deposits into **Defendant Account 4** between April 11, 2023, and May 25, 2023. However, of the $3,543,516.17 in deposits, $3,487,449.78 were inter-account transfers from **Defendant Account 3** made between April 17, 2023, and May 25, 2023, which, as discussed below, was funded almost entirely from **Defendant Account 4**. **Defendant Account 4** had an ending balance of $45,157.84 when JPMorgan Chase Bank locked the account.

30.     **Defendant Account 3** received total deposits of $9,044,282.84 between April 13, 2023, and May 31, 2023, of which $9,042,000.00 was funded from **Defendant Account 4**. There was a $0.00 balance in **Defendant Account 3** prior to receiving the first transfer from **Defendant Account 4**. **Defendant Account 3** had an ending balance of $5,069,044.50.

31.     **Defendant Account 1** received a total of $1,000,100.00 between April 12, 2023, and May 24, 2023, of which $1,000,000.00 was funded from **Defendant Account 4**. There was a

7

$100.00 balance in **Defendant Account 1** prior to receiving the $1,000,000.00 wire transfer from **Defendant Account 4**. **Defendant Account 1** had an ending balance of $1,001,104.35 when Bank of America closed the account.

32. **Defendant Account 2** received a total of $500,100.00 between April 12, 2023, and May 30, 2023, of which $500,000.00 was funded from **Defendant Account 4**. There was a $100.00 balance in **Defendant Account 2** prior to receiving the first transfer from **Defendant Account 4**. **Defendant Account 2** had an ending balance of $433,620.09² when Bank of America closed the account.

33. The diagram below shows the flow of funds through the **Defendant Accounts**.



34. Based on the information set forth above, Medicare disbursements made as a result of false claims for OTC Covid-19 test kits were distributed to the **Defendant Accounts**. Further,

---

² Law enforcement seized $433,475.70 from **Defendant Account 2**. It appears that this minor discrepancy is due to fees taken from Bank of America when it closed the account.

8

the proceeds of this scheme were transferred between the **Defendant Accounts** with the intent to conceal or disguise the nature, source, location, ownership or control of the Medicare disbursements for false claims. To the extent that any of the funds seized from the **Defendant Accounts** were not directly traceable to the Medicare disbursements for fraudulently billed OTC Covid-19 tests, they are still subject to forfeiture because they facilitated the concealment of the illicit nature of the Medicare disbursements in the **Defendant Accounts**.

## IV.   BASIS FOR FORFEITURE

35.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

36.  Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, which constitutes or is derived from proceeds traceable to a specified unlawful activity or a conspiracy to commit such offense is subject to civil forfeiture.

37.  Pursuant to 18 U.S.C. § 1956(c)(7)(F), any act or activity constituting an offense involving a "Federal health care offense" constitutes a specified unlawful activity.

38.  Pursuant to 18 U.S.C. § 24(b), health care fraud in violation of 18 U.S.C. § 1347 is a "Federal health care offense."

## FIRST CLAIM
### Proceeds of Health Care Fraud
### (18 U.S.C. § 981(a)(1)(C))

39. The factual allegations in paragraphs 1 through 38 are re-alleged and incorporated by reference as if fully set forth herein.

40. As set forth above, the funds seized from the **Defendant Accounts** are property that constitutes or are derived from proceeds traceable to health care fraud in violation of 18 U.S.C. § 1347, which is a specified unlawful activity pursuant to 18 U.S.C. § 1956(c)(7)(F).

41. Accordingly, the funds seized from the **Defendant Accounts** are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM
### Property Involved in Money Laundering or Traceable Thereto
### (18 U.S.C. § 981(a)(1)(A))

42. The factual allegations in paragraphs 1 to 38 are re-alleged and incorporated by reference as if fully set forth herein.

43. As set forth above, the funds seized from the **Defendant Accounts** were involved in transactions or attempted transactions of an offense in violation of 18 U.S.C. § 1956, and/or constitute property traceable to such property.

44. Accordingly, the funds seized from the **Defendant Accounts** are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, Plaintiff, the United States of America, requests that the Clerk of the Court issue a warrant for the arrest *in rem* of the funds seized from the **Defendant Accounts**; that notice of this action be provided to persons known or thought to have an interest in or right against the funds seized from the **Defendant Accounts**; that the funds seized from the **Defendant Accounts** be forfeited and condemned to the United States of America; and for such other and further relief as may be deemed just, necessary and proper.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   */s/ Nicole Grosnoff*
Nicole Grosnoff
Assistant United States Attorney
Court ID No. A5502029
nicole.s.grosnoff@usdoj.gov
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9294
Facsimile: (305) 536-4089

## **VERIFICATION**

I, Robyn Ziemer, hereby verify and declare, under penalty of perjury, that I am a Special Agent with the Department of Health and Human Services Office of Inspector General and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement agents, as well as my investigation of this case, together with others, as a Special Agent of the Department of Health and Human Services Office of Inspector General.

Executed on this 7th of June 2024.

_____
Robyn Ziemer
Special Agent, HHS-OIG